Mr. Chief-Justice Waite
delivered the opinion of the court:
Allison was an employé in the Government Printing Office from June 30,1866, to June 30, 1867, and, in this suit, claims additional compensation for his services in consequence of the Joint Resolution February 28, 1867. (14 Stat. L., 509.) He contends that the Government Printing Office was, during the fis *169 cal year commencing July 1,1866, a bureau in the Department of the Interior. If it was not, he substantially concedes he is not entitled to the benefit of the resolution.
The Department of the Interior is one of the executive departments of the Government. (Rev. Stat., § 437.) It was made so March 30,1849. (9 Stat., 395.) It is specially charged with the supervision of certain executive bureaus. Its present jurisdiction is defined in section 441, Revised Statutes. The Government Printing Office has never been placed under its jurisdiction by any express statute.
On the 26th August, 1852, Congress passed an act entitled “An act to provide for executing the public printing and establishing the prices thereof, and for other purposes.” (10 Stat. L., 30.) It is only necessary to say of this act, that it provided for the appointment of a superintendent of public printing, and that he was to give an official bond to be approved by the Secretary of the Iuterior. His duties were carefully defined, and he was made in fact, what his name implies, the superintendent of the public printing by the public printers. These public printers were, at that time, appointed by the two houses of Congress ; each house appointing its own.
On the 23d of June, 1860, a joint resolution was passed by Congress “inrelation to the public printing.” (12 Stat. L., 117.) This resolution dispensed with the public printers appointed by the two houses of Congress and placed the whole subject of public printing in charge of the superintendent. In the language of the resolution (sec. 2) he was “ to superintend all the printing and binding, the purchase of paper, * * * the purchase of other necessary materials and machinery, and the employment of proof-readers, compositors, pressmen, laborers, and other hands necessary to execute the orders of Congress and of the executive and judicial departments at the city of Washington.” To enable him more effectually to perform his duties he was to appoint a foreman of printing and a foreman of binding. These foremen were required to report to' him and to furnish him their estimates of the amount and kind of material required. He furnished them their supplies, for which they accounted to him. He was also to report to Congress at the beginning of each session the number of hands employed and the length of time each had been employed. And by section 9 it was made his duty to report to Congress “the exact condition *170 of the public printing, binding, and engraving; the amount and cost of all such printing, binding, and engraving; the amount and cost of all paper purchased for the same; a statement of the several bids for materials, and such further information as may be within his knowledge in regard to all matters connected therewith.” JBy section 3 he was required to render to the Secretary of the Treasury, quarterly, a full account of all purchases made by him and of all printing and binding done in his office for each of the houses of Congress and for each of the executive and judicial departments. The Secretary of the Treasury was also authorized to advance ifioney to him on account, and he was to settle his accounts of receipts and disbursements in the manner then required of other disbursing-officers. By section 9 it was made the duty of the Superintendent, annually, to prepare and submit to the Register of the Treasury, in time to have the same embraced-in the general estimates from that Department, detailed estimates of salaries and other necessary expenses of the printing establishment for the second year. By section 7, the Joint Committee on Printing for the two houses of Congress was directed to fix upon a standard of paper for the printing of congressional documents. The Superintendent was to advertise for proposals to furnish the Government all paper necessary for the execution of the public printing, and to furnish samples of the standard paper to applicants therefor. The bids were to be opened by him in the presence of the Secretary of the Senate and the Clerk of the House of Representatives, and he was required to award the contract to the lowest bidder. All differences in opinion between the Superintendent and the contractors were to be settled by the Joint Committee on Printing of the two houses. Whenever engraving was required to be done to illustrate any document ordered to be printed by either house of Congress, the Superintendent was to procure it to be done under the supervision of the Committee on Printing of the house making the order.- (Sec. 8.) By section 7 it was provided, that if the contractor for furnishing paper failed to make his deliveries, the Superintendent might purchase for temporary supply in the open market, “by and with the approval of the Secretary of the Interior.” He was also, by the same section, to render to the Secretary of the Interior, at the end of each fiscal year, an account of all paper received from contract *171 ors, and of all paper used for the purposes of the Government under that act, and also the amount of each class consumed in the printing establishment, and in what works the same were used. Defaults by contractors in furnishing paper under their contracts were to be reported by the Superintendent, with a full statement of all the facts, to the Solicitor of the Treasury for prosecution.
The commissions of all officers under the direction or control of the Secretary of the Interior must be made out and recorded in the Department of the Interior, and the seal of the Department must be affixed thereto. (10 Stat. L., 297, § 3.) The court below has found as a fact that “in 1867 the commission of the Superintendent of Public Printing was made out and recorded in the Department of the Interior, and the seal of the Department affixed thereto, pursuant to the provisions of” this act. It nowhere appears that any act of Congress expressly required this to be done; neither does it appear at what time in the year 1867 this commission was issued or recorded.
On the 22d February, 1867, Congress passed an act entitled “An act providingfor the election of the Congressional Printer.” By this act the Senate was to elect some competent person “to take charge of and manage the Government Printing Office.” He was given the same powers as the Superintendent of Public Printing. From and after the election of the Congressional Printer the office of Superintendent of Public Printing was abolished. (14 Stat. L., 397.) The Senate elected a Congressional Printer in pursuance of this act February 26, but he did not take possession of his office until March 1, and the Superintendent continued to act until that time. The Superintendent was acting on the 28th of February, when the resolution under which Allison claims was passed.
In Manning’s Case (13 Wall., 578; 7 C. Cls. R., 294) it appeared that the guards of the jail in the District of Columbia were selected by the warden, but that their compensation was fixed and paid by the Secretary of the Interior. It also appeared that the whole subject of the jail was under the supervision of the Secretary, to whom the warden was required to report. Under these circumstances we held that theoffice of the warden of the jail was a bureau or division of the Department of the Interior.
*172 This is as far as any case has yet gone. The Secretary of the Interior has no control whatever over the employment of men by the Superintendent of Public Printing. He cannot fix their wages or supervise the action of the Superintendent in that particular. He does not pay them, and has no control whatever of the funds out of which they are paid. He may pay the Superintendent for printing done upon the order of his Department, but the Superintendent disburses without any accountability to him. In short, the Superintendent seems to have a department of his own, in which he is in a sense supreme. Certainly he is not under the control of any one of the Executive Departments. Apparently he is more responsible to Congress than any ocher authority. The Secretary of the Interior keeps and approves his bond. The same Secretary must, under some circumstances, approve his purchases of paper in open market. He sends to that Department also his accounts of the receipts and disbursements of paper. The Joint Committee on Printing in the two houses of Congress settle all disputes between him and his contractors for the delivery of paper. He reports to Congress in respect to his employés, and to the Secretary of the Treasury in respect to his receipts and disbursements. From that Department also he draws his money upon proper requisitions. He is under the direction of the committees of each house of Congress in respect to engraving, and he goes to the Secretary of the Treasury with his estimates.
In our opinion his employés, as they are not specially enumerated, are not included in the resolution of February 28, 1867, and on that account this claim cannot be maintained.
The view we have taken of this case makes it unnecessary to consider the effect of the election of a Congressional Printer on the 26th February, 1867.
The judgment of the Court of Claims is reversed, and the cause remanded with instructions to dismiss the petition.